IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| The Honorable Wally Scott,<br>Mayor of the City of Reading | : | |
| | : | |
| | : | |
| v. | : | No. 1307 C.D. 2020 |
| | : | SUBMITTED: September 20, 2021 |
| City of Reading Charter Board, | : | |
| Appellant | : | |

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                    HONORABLE ELLEN CEISLER, Judge
                    HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE CEISLER                                             FILED:  October 14, 2021

Appellant City of Reading Charter Board appeals from the Court of Common Pleas of Berks County's (Common Pleas) November 16, 2020 order, by which Common Pleas reversed the Charter Board's December 13, 2019 Final Opinion and Order (Final Order). Through the Final Order, the Charter Board censured and fined The Honorable Wally Scott, Mayor of the City of Reading (Mayor Scott), for what the Charter Board deemed was Mayor Scott's failure to properly appoint a managing director for the City of Reading in a manner which complied with the City's Home Rule Charter. Additionally, the Charter Board challenges Common Pleas' June 29, 2020 order that granted Mayor Scott's Petition to Supplement the Record, which Mayor Scott had filed due to his belief that the record created before the Charter Board was incomplete. After thorough consideration, we reverse Common Pleas' June 29, 2020 order, vacate Common Pleas' November 16, 2020 order, and remand this matter to Common Pleas for additional proceedings.

## I. Background

In order to properly understand the legal and factual issues at play in this matter, one must first become familiar with the City of Reading's governance structure, as well as the nature of the Charter Board. The City of Reading is governed by a home rule charter (Home Rule Charter),[1] which it adopted as authorized by the Home Rule Charter and Optional Plans Law, 53 Pa. C.S. §§ 2901-84. The Home Rule Charter establishes a mayoral system, through which an individual is elected to a four-year term to serve as head of the City's executive branch. Home Rule Charter §§ 301-02.[2] As part of their responsibilities under the Home Rule Charter, the City's mayor is tasked with appointing a managing director for the City, who "shall be the chief administrative officer of the City, responsible to the Mayor for the administration of all City affairs placed in the Managing Director's charge pursuant to [the Home Rule] Charter[.]" *Id.* §§ 308(f), 406. At minimum, any candidate for this role must either "[h]ave a Master's degree in public administration, business administration, or its equivalent and have at least three years' experience at an executive or administrative level; or . . . [h]ave a Bachelor's degree in public administration, or its equivalent, and have at least five years of experience at an executive or administrative level." *Id.* § 401(b)(1)-(2).

The Home Rule Charter also sets forth the general process for appointing the City's managing director. "Within 90 days of taking office, the Mayor, with the approval of City Council, shall appoint a Managing Director for an indefinite term, subject to at least a biennial review, and fix the Managing Director's compensation."

---

[1] City of Reading Home Rule Charter, Berks County, Pa., *as amended* (1993), available at https://codelibrary.amlegal.com/codes/readingpa/latest/reading_pa/0-0-0-6 (last visited October 13, 2021).

[2] The City also has a seven-member elected City Council. Home Rule Charter § 201.

*Id.* § 401(a). "City Council approval shall be necessary for the hiring of the Managing Director appointed by the Mayor. Such approval shall be made within 30 days from the date of the appointment. If no action is taken by City Council within such period, the approval of the hiring of the candidate shall be automatic." *Id.* § 402(a). Should the mayor be unable to secure such an appointment, City Council is vested with the ability to name a "Temporary Managing Director," who does not have to be approved by City Council before assuming the position, but can serve in that role for no more than 90 days. *Id.* §401(d). If the mayor fails to successfully appoint a managing director within 180 days of assuming office, the responsibility for doing so shifts to City Council, which then has an additional 90 days to complete this task; if this occurs, "[t]he Mayor shall not have the power of veto over any candidate hired by City Council[.]" *Id.* § 401(e). These requirements and deadlines also apply in the event that the position subsequently becomes vacant for any reason; thus, the City's mayor has 90 days to appoint a new managing director and gain City Council's approval of the appointment, calculated from the date upon which the vacancy occurred, with City Council taking over this duty itself if the mayor has failed to successfully appoint someone to the position within 180 days of the vacancy's creation. *Id.* § 403(a).

As for the Charter Board, it was established via referendum after the City's residents voted in favor of Amendment I to the Home Rule Charter in November 2002, and is "composed of five residents of the City of Reading . . . [who are each] appointed by the Mayor with the consent of City Council." City of Reading Code of

Ordinances (Reading Code) § 23-602(A)(1).[3] The Home Rule Charter sets forth the

Charter Board's enforcement powers and duties as follows:

> [Home Rule] Charter enforcement powers. The [Charter] Board shall have the following powers and duties with respect to Charter enforcement. It shall:
>
> > (1) Hear and decide all complaints alleging violations of the [Home Rule] Charter and Administrative Code,[4] except that its jurisdiction shall not extend to cases arising under the Ethics Code or the Personnel Code of the City of Reading.
> >
> > (2) Impose penalties and administrative fines and refer matters to law enforcement, regulatory, or other authorities with jurisdiction over these matters.
> >
> > (3) Initiate preliminary investigations on its own motion, through the [i]nvestigative [o]fficer.
> >
> > (4) Appoint an [i]nvestigative [o]fficer to conduct investigations and to issue findings reports where appropriate.
> >
> > (5) Hold hearings, issue subpoenas and compel the attendance of witnesses, administer oaths, take testimony, require evidence on any matter under investigation before the [Charter] Board, and issue orders, including but not limited to adjudications and penalties.
> >
> > (6) Adopt rules and regulations to administer, implement, enforce and interpret the [Charter] Board ordinance.
> >
> > (7) Have all other powers necessary and appropriate to effectuate the purposes set forth herein and in Amendment I of the [Home Rule] Charter.

---

[3] City of Reading Code of Ordinances, Berks County, Pa., *as amended* (2013), available at https://codelibrary.amlegal.com/codes/readingpa/latest/reading_pa/0-0-0-1 (last visited October 13, 2021).

[4] The Administrative Code exists as Sections 5-101 through 5-1012 of the Reading Code. Reading Code §§ 5-101-5-1012.

*Id.* § 23-603(A).[5] The investigative officer serves at the Charter Board's pleasure and is responsible for "determining jurisdiction, conducting preliminary and full investigations, issuing written findings reports, [and] prosecuting complaints before evidentiary hearings," and, with the exception of providing the Charter Board with status updates every six months, operates in an independent fashion "and without comment or inquiry from the [Charter] Board[.]" *Id.* § 23-602(A)(8)(a), (d).

This is the legal framework within which the instant dispute between Mayor Scott and the Charter Board arose. Mayor Scott assumed office in January 2016 and, shortly thereafter, appointed Glenn Steckman as the City's managing director. Charter Board Hearing Tr., 11/14/19, at 129-30; Reproduced Record (R.R.) at 186a. City Council then approved Steckman's appointment to this position in May 2016, when it passed a resolution to that effect. Final Order, Findings of Fact (F.F.) ¶5; R.R. at 567a. In September 2018, Mayor Scott fired Steckman and, on September 22, 2018, publically declared that he was naming Osmer S. Deming as the City's "acting" managing director as of October 5, 2018. Final Order, F.F. ¶¶7-8; R.R. at 568a. Even so, Mayor Scott never stated that Deming was his appointee for managing director, nor did he seek City Council's ratification of Deming's appointment to that position. Final Order, F.F. ¶21; R.R. at 570a. As such, City Council never formally recognized Deming's assumption of this role. Instead, City Council took two steps. First, it passed Resolution 47-2019 on April 22, 2019, through which it affirmed the Home Rule Charter's language regarding the appointment of a managing director, stated that Mayor Scott had failed to appoint someone to that position within 180 days of Steckman's firing, and declared its intent to hire a managing director itself. R.R. at 551a-52a. Second, it announced on April

---

[5] The Reading Code also imbues the Charter Board with advisory and educational powers, neither of which are relevant to this matter. *See* Reading Code § 23-603(B)-(C).

5

30, 2019, that because more than 180 days had lapsed since Steckman had been fired, it intended to seek applicants for the managing director position. *Id.* at 93a-94a, 187a.[6] That same day, Deming proclaimed through a Facebook post that he was "under law, the Managing Director of the City of Reading." *Id.* at 359a. Deming also made a similar, contemporaneous statement to the Reading Eagle, a local newspaper, in which he stated that "[p]er the . . . Home Rule Charter, I am, by operation of law, the Managing Director. I am no longer 'acting.'" *Id.* at 96a. Deming also threatened to pursue legal action against City Council if it elected to press on with appointing another managing director. *Id.*

This prompted Ernest Schlegel, a City resident, to file a complaint with the Charter Board's investigative officer in early May 2019, in which Schlegel alleged that Mayor Scott had violated the Home Rule Charter, specifically Sections 401(a), (c),[7] and (d), and 402(a), by virtue of the manner in which he had appointed Deming. *Id.* at 66a-106a. The investigative officer then contacted Mayor Scott and Schlegel on May 9, 2019, informed them that she was embarking upon a preliminary investigation of Schlegel's allegations, notified them that mediation was available, and invited each of them to provide her with information and documentation to assist her investigative efforts. *Id.* at 745a. Unlike Schlegel, Mayor Scott did not cooperate in any substantive way with this preliminary investigation. *See id.* at 745a-46a. On June 10, 2019, the investigative officer advised the Charter Board, Mayor Scott, and

---

[6] Deming provided his resume to City Council at some point in March 2019; however, this was done prior to City Council's announcement and was not accompanied by any indication from Mayor Scott that he sought to appoint Deming as the City's managing director. *See* Final Order, F.F. ¶¶24, 30-31, 33; Charter Board Hearing Tr., 11/14/19, at 34, 71-73.

[7] Section 401(c) of the Home Rule Charter reads as follows: "City Council may, by ordinance, establish additional qualifications for the position of Managing Director, prior to advertisement for the hiring of the Managing Director." Home Rule Charter § 401(c).

Schlegel that she had determined that a full investigation was warranted, which she labelled "Investigation No. 54," and that she would either issue findings for Investigation No. 54 or end her investigation within 90 days. *Id.* at 109a. On September 9, 2019, the investigative officer issued a findings report for Investigation No. 54, in which she summarized her efforts and concluded that Mayor Scott had indeed violated the Home Rule Charter through his handling of Deming and the managing director vacancy. *Id.* at 749a-51a.

In response, Mayor Scott requested that the Charter Board hold an evidentiary hearing to address Schlegel's complaint. *Id.* at 110a; *see* Reading Code § 23-605(6)-(8) (subject of Charter Board investigation has 20 days from issuance of investigative officer's findings report to seek evidentiary hearing before Charter Board, after which Charter Board will "deliberate on the evidence to determine whether the subject . . . violated the [Home Rule] Charter or the Administrative Code"). On October 2, 2019, the Charter Board notified both the investigative officer and Mayor Scott's counsel via letter that it would hold the evidentiary hearing on November 12, 2019. R.R. at 111a-12a. In this letter, the Charter Board requested pre-hearing memoranda from the investigative officer and Mayor Scott, to be submitted no later than November 4, 2019. *Id.*

Separately, the investigative officer received another complaint from Schlegel on September 24, 2019. *Id.* at 192a, 638a. Therein, Schlegel claimed that Deming did not possess the qualifications required under the Home Rule Charter for the managing director position and, in addition, had violated the Home Rule Charter by serving as the City's acting managing director for more than 180 days. *Id.* at 638a-40a. The investigative officer deemed Schlegel's allegations worthy of additional scrutiny and consequently opened a preliminary investigation under the title

7

"Investigation No. 57." *Id*. On October 1, 2019, the Charter Board passed Resolution No. 1-2019, through which it adopted Board Action No. 1, which redundantly directed the investigative officer to begin a preliminary investigation of Schlegel's new complaint against Deming. *Id.* at 754a.

The investigative officer subsequently filed a timely pre-hearing memorandum for Investigation No. 54, but Mayor Scott did not do the same; instead, Mayor Scott informed the Charter Board that he was declining to do so because the Charter Board was also pursuing Board Action No. 1 against him, which he argued was "allegedly based upon the same facts as alleged within this matter[,]" *i.e.*, Investigation No. 54. *Id.* at 184a. Additionally, Mayor Scott filed what he called "pre-hearing motions and objections," through which he argued that the Charter Board should dismiss Investigation No. 54 for 2 reasons: first, Common Pleas, not the Charter Board, had original jurisdiction to consider the allegations Schlegel had made in his May 2019 administrative complaint; and second, the Charter Board's exercise of jurisdiction over Investigation No. 54 would violate his due process rights by virtue of the Charter Board's adoption of Board Action No. 1 and pending consideration of Investigation No. 57. *Id.* at 192a-93a.

The Charter Board then convened the evidentiary hearing regarding Investigation No. 54, as scheduled, on November 12, 2019. At the outset, Mayor Scott's counsel informed the Charter Board that he had instructed Deming not to appear at the hearing, despite the fact that the Charter Board had issued a subpoena requesting Deming's presence. Charter Board Hearing Tr., 11/12/19, at 10-14; *see* R.R. at 326a. Schlegel was the only witness who testified on that day. *See* Charter Board Hearing Tr., 11/12/19, at 43-110. The hearing continued on November 14, 2019, during the course of which both Linda Kelleher, the City's clerk, and Mayor

8

Scott testified. Charter Board Hearing Tr., 11/14/19, at 9-144. Notably, Mayor Scott failed to offer evidence regarding Deming's credentials on either occasion.

The Charter Board then issued its Final Order on December 13, 2019. Therein, the Charter Board made factual findings, the vast bulk of which can be sorted into a number of general categories. First, it is generally understood that the process of selecting a managing director starts with the mayor formally notifying City Council that he or she has appointed someone to the position, is followed by City Council interviewing the prospective appointee, and ends with City Council either solemnizing its approval by passing a resolution to that effect, or declining to confirm the candidate. Final Order, F.F. ¶¶3-5, 29; R.R. at 567a, 571a. Second, Mayor Scott never informed City Council of his desire to appoint Deming as the City's managing director, despite his familiarity with how such appointments were handled. Final Order, F.F. ¶¶5, 20-23, 30-37; R.R. at 567a, 570a-72a. Third, Mayor Scott appointed Deming to the role of acting managing director, which is synonymous with the Home Rule Charter-described position of temporary managing director. Final Order, F.F. ¶¶7-10; R.R. at 568a. Fourth, Deming's term as acting managing director ended on January 5, 2019, but he never vacated the position and instead held himself out to be the City's managing director. Final Order, F.F. ¶¶14-16; R.R. at 569a. Despite this, Mayor Scott failed to remove Deming from office. Final Order, F.F. ¶41; R.R. at 573a. Fifth, independent of Mayor Scott's failure to formally appoint Deming as managing director, it remained that Deming did not have the necessary academic background or experience to serve in that capacity. Final Order, F.F. ¶¶11-13; R.R. at 568a-69a.

Then, after denying Mayor Scott's jurisdictional challenges, the Charter Board concluded that Mayor Scott had committed numerous violations of the Home

Rule Charter, specifically of Sections 301;[8] 308(a), (f), (g), (m), and (n);[9] 311;[10] 401(a) and (d); 402(a); and 404,[11] as well as of Home Rule Charter Amendment I,

---

[8] Section 301 provides that "[t]he executive, administrative, and law enforcement powers of the City shall be vested in the Mayor. The Mayor shall control and be accountable for the executive branch of City government, as provided by this [Home Rule] Charter." Home Rule Charter § 301.

[9] Section 308 states, in relevant part:

The Mayor shall have the following powers and duties:

(a) Execute, enforce, and obey the ordinances of the City and laws of the Commonwealth of Pennsylvania and the United States of America.

. . . .

(f) Be responsible for the hiring, with the approval of [City] Council, of the City Managing Director.

(g) Direct the administration of all departments, offices, and agencies of the City as supervised by the Managing Director, except as otherwise provided by this [Home Rule] Charter or by law.

. . . .

(m) Unless otherwise provided, be responsible for the employment of personnel necessary for the effective operation of City government.

(n) Perform such other duties and exercise such other powers as stated in this [Home Rule] Charter, by law, or ordinance.

Home Rule Charter § 308(a), (f), (g), (m), and (n).

[10] Section 311 authorizes the City's mayor to "remove from office anyone appointed pursuant to [Home Rule Charter Section] 309(b), unless otherwise provided by law." Home Rule Charter § 311; *see id.* § 309 ("The Mayor shall appoint . . . (b) All members of boards, authorities and commissions, over which he has the power to appoint. Four affirmative votes of [City] Council shall be necessary for confirmation.").

[11] Section 404 reads, in relevant part:

**(Footnote continued on next page…)**

Section 1(a),[12] by failing to properly appoint Deming as managing director, allowing Deming to nevertheless occupy the office of managing director, and failing to remove Deming from the position of temporary managing director once his term had lapsed. Final Order, Conclusions of the Board, Discussion; *id.*, Determination of the Board ¶¶1-7; R.R. at 577a-89a. Accordingly, the Charter Board ruled that Mayor Scott should be publically censured and levied against him a $1,000 administrative fine, as well as a $1,000 penalty fine. Final Order, Penalties Imposed; *id.*, Order; R.R. at 590a-97a. Mayor Scott then appealed the Final Order to Common Pleas on December 31, 2019.

On January 14, 2020, the investigative officer issued her findings report for Investigation No. 57 and Board Action No. 1. Therein, the investigative officer made conclusions that are reducible to two points. First, she referenced college and law school transcripts, as well as information regarding Deming's work history, which Deming had provided during the course of this investigation and concluded that

> (a) The Managing Director may be removed from office by the Mayor at any time, without cause.
>
> (b) At least 15 days prior to the removal from office, the Mayor shall notify the Managing Director and City Council in writing of such removal.

Home Rule Charter § 404(a), (b).

[12] This portion of Amendment I states as follows:

> **Governing law of the City.** This [Home Rule] Charter is the governing law of the City of Reading. No action or inaction by City Council, the Administration, or any other body created by this [Home Rule] Charter shall be taken contrary to it, whether individually or collectively, by ordinance, resolution, practice, executive order or decision, or any other means. The wording of the [Home Rule] Charter, and acts pursuant to it, shall in all cases be strictly construed so as to effectuate its clear intent.

Home Rule Charter, amend. I, §1(a) (emphasis in original).

these materials established that Deming satisfied the Home Rule Charter's credential requirements for the managing director position. R.R. at 643a-44a. Second, the investigative officer determined that the Home Rule Charter does not legally obligate a person serving as acting or temporary managing director to resign once their term has ended. *Id.* at 644a-45a. Consequently, the investigative officer ruled that Deming had not violated the Home Rule Charter and closed both Investigation No. 57 and Board Action No. 1. *Id.* at 645a.

On February 17, 2020, Mayor Scott petitioned Common Pleas for leave to supplement the record with the investigative officer's January 14, 2020 findings report and for permission to issue subpoenas for relevant communications from City Council and the investigative officer. *Id.* at 623a-28a. Mayor Scott argued that this was necessary because the January 14, 2020 findings report contradicted the Charter Board's determination that Deming was not qualified to serve as managing director, as well as because he believed the communications would "enable [him] to present a defense and reveal whether there is evidence of any bias[.]" *Id.* at 627a-28a. Common Pleas granted Mayor Scott's petition over the Charter Board's opposition on June 29, 2020.

On November 16, 2020, Common Pleas reversed the Final Order. This appeal by the Charter Board to our Court followed shortly thereafter. In response, Common Pleas ordered the Charter Board to file a statement of errors complained of on appeal, which the Charter Board did on January 25, 2021. Common Pleas then issued an opinion on February 5, 2021, in which it explained why it had ruled in favor of Mayor Scott. First, Common Pleas stated that its decision to allow Mayor Scott to supplement the record was entirely justified. Common Pleas Op., 2/5/21, at 6. According to Common Pleas, the investigative officer's January 14, 2020 findings

12

report, in which the investigative officer concluded that Deming possessed adequate qualifications to become the City's managing director, constituted proof that the Charter Board's record had been incomplete. *Id.* at 6-7. As such, Common Pleas reasoned that the record could not be deemed complete without the inclusion of this findings report. *Id.* at 7. Second, Common Pleas determined that Mayor Scott had properly preserved the issue of whether the Charter Board's Final Order was supported by substantial evidence. *Id.* Finally, Common Pleas ruled that the Charter Board's determinations that Deming did not possess adequate qualifications for the managing director position, and that the Home Rule Charter articulated a process for appointing the City's managing director, were not supported by substantial evidence. *Id.* at 7-8. Common Pleas, however, failed to address many of the arguments Mayor Scott had put forth on appeal from the Charter Board, specifically that the Charter Board: (1) lacked jurisdiction to consider Schlegel's complaint, because its enforcement powers unconstitutionally usurped adjudicatory authority that was reserved for the courts of common pleas; (2) had violated his due process rights throughout the process of adjudicating Schlegel's complaint; (3) had unlawfully punished him for violations of the Home Rule Charter that had not been alleged in Schlegel's complaint or pertained to sections of the Home Rule Charter that did not apply to him; and (4) had levied penalties upon him that were unlawful, unconstitutionally imposed, and were not supported by substantial evidence. *See id.* at 6-8; R.R. at 709a-23a, 732a-39a.

## II. Discussion

Preliminarily, we note that Mayor Scott argued to Common Pleas that the Charter Board lacked jurisdiction to consider Schlegel's complaint against him, and that the matter should have instead been heard by Common Pleas, because the

13

Charter Board's adjudicatory and punitive powers unconstitutionally invade the purview of our Commonwealth's unified judicial system. *See* R.R. at 706a-10a. Again, this claim was not addressed by Common Pleas, but is reiterated by Mayor Scott in his appellate brief. Mayor Scott's Br. at 48-54. Accordingly, we deem it necessary to consider this argument at this juncture. *See Dep't of Env't Prot. v. Cromwell Twp., Huntingdon Cnty.*, 32 A.3d 639, 646 (Pa. 2011) ("The question whether a court has jurisdiction . . . may be raised at any time in the course of the proceedings, including by a reviewing court *sua sponte*.").

The answer to this jurisdictional question is rooted in the City's home rule powers.

> Municipalities are creatures of the state and have no inherent powers of their own, *see Naylor v. Township of Hellam*, . . . 773 A.2d 770, 773 ([Pa.] 2001); rather, they "possess only such powers of government as are expressly granted to [them] and as are necessary to carry the same into effect." *Appeal of Gagliardi*, . . . 163 A.2d 418, 419 ([Pa.] 1960); *see also Philadelphia v. Fox*, 64 Pa. (14 Smith) 169, 180-81 (1870). Therefore, a municipality ordinarily lacks the power to enact ordinances except as authorized by statute, and any ordinance not in conformity with its enabling statute is void. *See Taylor v. Abernathy*, . . . 222 A.2d 863, 865 ([Pa.] 1966). Under the concept of home rule, however, the locality in question may legislate concerning municipal governance without express statutory warrant for each new ordinance; rather, its ability to exercise municipal functions is limited only by its home rule charter, the Pennsylvania Constitution, and the General Assembly. *See In re Petition to Recall Reese*, . . . 665 A.2d 1162, 1164 ([Pa.] 1995). *See generally* PA. JUR.2D Municipal and Local Law § 3:42 (2002); McQuillin, THE LAW OF MUNICIPAL CORPORATIONS § 10:13 (3d ed.2004); Gary E. French, *Home Rule in Pennsylvania*, 81 DICK. L.REV. 265 (1977).

*City of Philadelphia v. Schweiker*, 858 A.2d 75, 84 (Pa. 2004).

> This account, of course, is consistent with the constitutional provision governing home rule, *see* Pa. Const. Art. IX, § 2 . . . ; the Home Rule Charter and Optional Plans Law, 53 Pa. C.S. § 2961 (providing that a home rule municipality "may exercise any powers and perform any function not denied by the Constitution of Pennsylvania, by statute or by its home rule charter"); and its explication in our caselaw. *See, e.g.*, [*Cnty.*] *of Delaware v.* [*Twp.*] *of Middletown*, . . . 511 A.2d 811, 813 ([Pa.] 1986). Moreover, such grants of municipal power "shall be liberally construed in favor of the municipality." *Id.* Thus, "[i]n analyzing a home rule municipality's exercise of power, . . . we begin with the view that it is valid absent a limitation found in the [Pennsylvania] Constitution, the acts of the General Assembly, or the charter itself, and we resolve ambiguities in favor of the municipality." *Id.* at 813.

*Nutter v. Dougherty*, 938 A.2d 401, 411 (Pa. 2007). To that end, home rule municipalities have the ability to exercise their powers regarding "matters affecting merely the *personnel* and *administration* of the offices local to [those municipalities] and which are of no concern to citizens elsewhere." *Lennox v. Clark*, 93 A.2d 834, 845 (Pa. 1953) (emphasis in original).

As already noted, the Charter Board is vested with the right to consider complaints regarding alleged violations of the Home Rule Charter and the Administrative Code, each of which are local ordinances that pertain exclusively to the governance of the City of Reading and the duties imposed upon the City's officeholders. Reading Code § 23-603(A)(1); *see generally id.* §§ 5-101–5-1012 (City's Administrative Code); Home Rule Charter, Preamble, §§ 101-1313. It also has the authority to adjudicate those complaints, to impose civil penalties and fines upon a complaint's subject as it deems necessary, and to refer matters to other authorities if it believes violations have occurred of laws or regulations that are outside its purview. *Id.* § 23-603(A); *see id.* § 23-605(B) (setting forth the actions

15

the Charter Board may take, and the penalties it may impose, upon a determination that an accused individual has violated the Home Rule Charter and/or the Administrative Code). Such limited jurisdiction and abilities neither exceed the City's home rule powers, contravene our Commonwealth's Constitution, nor push into areas which are the judiciary's exclusive purview. This is especially true when the subject of a Charter Board action is, as here, a high elected official who has been accused solely of acting in disregard of their municipality's foundational ordinances and regulations.

With that resolved, we turn to the Charter Board's appellate arguments, which we have summarized and reordered as follows for clarity's sake. First, Common Pleas should not have granted Mayor Scott's petition to supplement the record, as Mayor Scott failed to provide a legally valid justification for his request. Charter Board's Br. at 47-52. Second, Common Pleas erred by applying the wrong standard of review to Mayor Scott's appeal as, in light of Common Pleas' determination that the record from the Charter Board was incomplete, it either had to review the entire record *de novo* after accepting more evidence, or remand to the Charter Board for additional proceedings. *Id.* at 45-46. Third, Mayor Scott waived his ability to argue that the Final Order is not supported by substantial evidence, as he failed to present that issue on appeal to Common Pleas. *Id.* at 56. Finally, the Charter Board's findings, conclusions, and determinations in its Final Order are supported by substantial evidence. *Id.* at 52-56, 57-59.

Appeals to Common Pleas from Charter Board actions are governed by the Local Agency Law, 2 Pa. C.S. §§ 551-555, 751-54. *Mukerji v. City of Reading Charter Rev. Bd.*, 941 A.2d 102, 104 n.3 (Pa. Cmwlth. 2008). Accordingly, the standard of review that must be applied by Common Pleas is contingent upon the

16

state of the record from below. Where Common Pleas determines that the record is full and complete, and takes no additional evidence, its review is limited to determining whether the Charter Board committed constitutional violations or errors of law, as well as whether the Charter Board abused its discretion, such that its factual findings are not supported by substantial evidence. 2 Pa. C.S. § 754(b).[13] "The record before a local agency is full and complete if there is a complete and accurate record of the testimony taken so that the appellant is given a basis upon which he may appeal, and the appellate court has a sufficient record upon which to rule on questions presented." *Ret. Bd. of Allegheny Cnty. v. Colville*, 852 A.2d 445, 451 (Pa. Cmwlth. 2004). However, in the event a court of common pleas determines that the record is incomplete, it "may hear the appeal *de novo*, or may remand the proceedings to the local agency for the purpose of making a full and complete record or for further disposition in accordance with the order of the court." 2 Pa. C.S. § 754(a).

Here, Common Pleas granted Mayor Scott's Petition to Supplement the Record through its June 29, 2020 order, but subsequently reversed the Charter Board's Final Order due to the putative lack of substantial record evidence supporting the Charter Board's determinations. Common Pleas Op., 2/5/21, at 6-8. In doing so, Common Pleas committed multiple errors.

First, by virtue of its decision to let him supplement the record, Common Pleas was obligated to consider Mayor Scott's appeal *de novo*. 2 Pa. C.S. § 754(a). Instead of doing this, however, it added these supplemental items to the evidence from below and improperly reweighed the combined materials to conclude that the Charter

---

[13] "Substantial evidence is the relevant evidence a reasonable mind can accept as adequate to support a conclusion[.]" *Bovino v. Bd. of Sch. Dirs. of Indiana Area Sch. Dist.*, 377 A.2d 1284, 1287 (Pa. Cmwlth. 1977).

Board's determinations were factually unsupported. Common Pleas' treatment of the evidence before it was therefore legally incorrect. *See Avery v. City of Phila. Bd. of Pensions & Ret.*, 212 A.3d 566, 571 n.7 (Pa. Cmwlth. 2019) ("On appeal from an agency's adjudication, the trial court may review the agency's decision based on its supported factual findings or, if the record is incomplete, it may hold a *de novo* hearing. It cannot accept a document *dehors* the record and then re-weigh the evidence before the agency and find its own facts.").

Second, and independent of that mistake, Common Pleas should not have permitted Mayor Scott to supplement the record. Our Court's handling of *City of Philadelphia v. Murphy*, 320 A.2d 411 (Pa. Cmwlth. 1974), informs our conclusion on this point. In *Murphy*, a City of Philadelphia police officer was struck on the left side of his head while subduing an unruly prisoner. 320 A.2d at 413. Shortly thereafter, the officer began having headaches, as well as memory and speech issues, which ultimately led to his hospitalization for 20 days and a diagnosis that he had sustained an injury to his left cerebral artery. *Id.* As a result, he was unable to return to work for an extended period of time and applied for disability benefits. *Id.* He then

> had a conference on September 15, 1971[,] with a "safety officer" appointed by the [Philadelphia] Police Department. After considering evidence presented by the [police officer], the "safety officer" found that no proof had been presented that the [officer's] difficulties were causally related to the blow on his head, and that, therefore, his disability was not service-connected. The Police Commissioner approved these findings and denied benefits. The [police officer] then appealed to the [Philadelphia Civil Service] Commission, which also found a lack of evidence as to causation and held the disability not to be service-connected.

18

*Id.* The police officer appealed to the Court of Common Pleas of Philadelphia County and subsequently presented a letter to the court, in which a physician who had treated his injuries opined that there was a causal connection between the police officer's incident with the prisoner and the officer's subsequent medical issues. *Id.* Upon consideration of the letter, the Court of Common Pleas of Philadelphia County remanded the matter to the Commission, with instructions that it task a panel of medical experts with considering the letter and authoring a report, after which the Commission was to consider the experts' report before issuing a new decision concerning the disability application. *Id.* We reversed, on the basis that the police officer had failed to satisfy his burden of proof regarding what had caused his injuries. *Id.* at 414-15. In doing so, the *Murphy* Court noted that

> [t]he only possible evidence of causation presented by the [police officer] was a letter introduced, not in his hearing before the Commission, but in his argument before the lower court. This was a letter written two months after the issuance of the Commission's adjudication by a doctor who had been available to the [officer] at the time of the Commission's hearing and whose diagnosis had already been introduced. It is true, of course, that, as provided [by] the Local Agency Law, . . . if the court below believed that a full and complete record of the proceedings before the Commission had not been made, it could have heard the matter *de novo* or remanded it to the Commission for the purpose of making a full and complete record. We believe, moreover, that a lower court has [] wide discretion in determining whether or not a full and complete record has been made and, if not, what course to follow to correct the situation. If, for example, the proofs introduced by a party are incompetent, or if after-discovered evidence is made available, or if the Commission had capriciously ignored or improperly excluded material evidence, we would hold that a lower court might reasonably remand for another hearing. ***But we believe that in a situation such as this, where the [officer] made no effort to introduce evidence on a material issue before the Commission, although he***

19

***then had the evidence available, the lower court should have treated the case as if a full and complete record had already been made below*** and should not have remanded.

*Id.* (emphasis added; footnotes, citations, and some punctuation omitted).

The same logic applies here. As recounted above, Mayor Scott had numerous chances to present the Charter Board with evidence regarding Deming's credentials, but consistently failed to avail himself of those opportunities. Therefore, Common Pleas should not have permitted Mayor Scott to supplement the record with the investigative officer's January 14, 2020 findings report. This is because the evidence referenced in that report regarding Deming's coursework in college and law school, which Mayor Scott used to show that Deming was qualified for the managing director position, could have been obtained and presented by Mayor Scott well before that report was released.

Third, to the extent that Common Pleas relied upon or credited any legal conclusions made by the investigative officer, it did so in error. *See, e.g.*, Common Pleas Op., 2/5/21, at 8 ("The Investigative Officer's Findings concluded the [Home Rule] Charter did not specify the process for appointment of the Managing Director."). Under the Home Rule Charter, "[t]he investigative officer is limited to conducting investigations at the Charter Board's request, and issuing findings of fact . . . [, but] is not expressly authorized to make conclusions of law[.]" *Reading City Council v. City of Reading Charter Bd.* (Pa. Cmwlth. No. 29 C.D. 2012, filed Oct. 23, 2012), slip op. at 15, 2012 WL 8654994, at \*8; *see* Commonwealth Court Internal Operating Procedure § 414(a), 210 Pa. Code § 69.414(a) (unreported Commonwealth Court opinions issued after January 15, 2008 may be cited for their persuasive value). As such, the investigative officer's determinations regarding issues of law in this matter neither bound the Charter Board nor should have been

given any particular weight by Common Pleas. *See Reading City Council*, slip op. at 15, 2012 WL 8654994, at *8.

Next, we disagree with the Charter Board that Mayor Scott waived his ability to argue that its factual determinations were not supported by substantial evidence. The Charter Board's argument is premised on the fact that Mayor Scott did not use the term "substantial evidence" in the appeal paperwork he filed with Common Pleas. Charter Board's Br. at 56; *see* R.R. at 3a-60a (Mayor Scott's "Petition for Review"). While it is true that this phrase is absent from Mayor Scott's "Petition for Review," it is equally true that our courts "have repeatedly held that use or non-use of 'magic words' is not dispositive as it relates to legal issues." *Seech v. Gateway Sch. Dist.* (Pa. Cmwlth., No. 1417 C.D. 2017, filed Nov. 24, 2020), slip op. at 12, 2020 WL 6883203, at *6. Here, Mayor Scott repeatedly alleged in his Common Pleas-level "Petition for Review" that the record evidence did not support the Charter Board's factual determinations. *See* R.R. at 6a, 9a-17a. In doing so, he was effectively asserting that substantial evidence did not exist, in that the record allegedly lacked evidence that "a reasonable mind [could] accept as adequate to support [the Charter Board's] conclusion[s.]" *Bovino*, 377 A.2d at 1287. As such, the Charter Board's waiver argument is without merit.

Nevertheless, it remains that Common Pleas erred when it concluded that the Charter Board's determinations were not supported by substantial evidence. In justifying its conclusion, Common Pleas reasoned that the Home Rule Charter does not clearly lay out the specific process through which the City's managing director must be appointed and, in essence, that the Charter Board had punished Mayor Scott for disregarding historical practices and uncodified customs. *See* Common Pleas Op., 2/5/20, at 7-8. Common Pleas is correct in a sense, in that the Home Rule

Charter does not provide a detailed, step-by-step roadmap for such an appointment. However, the Home Rule Charter *does* provide a certain amount of unambiguous guidance on this front. When interpreting local ordinances, we apply the rules of statutory construction. *In re Holtz*, 8 A.3d 374, 378 (Pa. Cmwlth. 2010).

> The primary objective of statutory interpretation is to determine the intent of the enacting legislation. Section 1921 of the Statutory Construction Act of 1972 (Act), 1 Pa. C.S. § 1921. In pursuing that end, we are mindful that a statute's plain language generally provides the best indication of legislative intent and, thus, statutory construction begins with examination of the text itself. *Malt Beverages* [*Distribs. Ass'n*] v. [*Pa.*] *Liquor Control* [*Bd.*], 918 A.2d 171, 176 (Pa. Cmwlth. 2007) (en banc), *aff'd*, . . . 974 A.2d 1144 ([Pa.] 2009). In reading the plain language of a statute, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage." Section 1903(a) of the Act, 1 Pa. C.S. § 1903(a).

*Kohl v. New Sewickley Twp. Zoning Hearing Bd.*, 108 A.3d 961, 968 (Pa. Cmwlth. 2015). "Where a term is not expressly defined in a statute, . . . we may look to dictionary definitions" in order to ascertain their common and approved usage. *Moonlite Cafe, Inc. v. Dep't of Health*, 23 A.3d 1111, 1114 (Pa. Cmwlth. 2011). As already noted, the Home Rule Charter specifically states that "[w]ithin 90 days of taking office, the Mayor, with the approval of City Council, shall appoint a Managing Director for an indefinite term," and that this requirement also applies in the event the managing director position becomes vacant at any other point. Home Rule Charter §§ 401(a), 403(a). Separately, the Home Rule Charter expressly reiterates the requirement that the City's mayor is responsible for appointing a managing director, that City Council has 30 days from the date of appointment to act upon the appointment, and that City Council's failure to do so within that time window results in automatic approval of the appointed individual. *Id.* §§ 308(f), 311,

402(a). Thus, by its plain language, the Home Rule Charter, at minimum, places upon the City's mayor a legal duty to appoint a managing director within 90 days of a vacancy in that position, after which the appointee takes office upon either City Council's express approval or the passage of 30 days without that body taking action.

Here, Mayor Scott never kicked off this process, though, because he failed to appoint anyone to be the City's managing director. Though the Home Rule Charter does not contain a definition for "appoint," Merriam-Webster defines the word, in relevant part, as "to name officially."[14] There is no evidence in the record establishing that Mayor Scott officially named Deming as the City's managing director. Instead, he appointed Deming to be the "acting" managing director, a title that does not exist in the Home Rule Charter and that Mayor Scott appears to have plucked out of thin air. In this context, the common parlance of "acting" is "holding a temporary rank or position [and/or] performing services temporarily[.]"[15] The meaning of acting managing director is thus *synonymous* with temporary managing director, a position that *is* specifically mentioned in the Home Rule Charter and which has a maximum defined term length of 90 days. Home Rule Charter § 401(d). It is apparent, then, that Mayor Scott appointed Deming to serve as the City's temporary managing director, a position Deming was only allowed to legally occupy for up to 90 days, and never presented Deming as his appointee for the more permanent role of managing director. Therefore, substantial evidence supports the Charter Board's determinations that Mayor Scott violated the Home Rule Charter by failing to fulfill his legal duty to appoint a managing director within 90 days of the

---

[14] *Appoint*. Merriam-Webster.com. https://www.merriam-webster.com/dictionary/ appoint (last visited October 13, 2021).

[15] *Acting*. Merriam-Webster.com. https://www.merriam-webster.com/dictionary/acting (last visited October 13, 2021).

position becoming vacant, that he allowed Deming to remain in the role of "acting" or temporary managing director for more than the legally permitted 90 days, and that he never exercised his legal authority derived from the Home Rule Charter to remove Deming from office.

### III. Conclusion

In light of the foregoing analysis, we reverse Common Pleas' June 29, 2020 order, through which it granted Mayor Scott's Petition to Supplement the Record. Furthermore, we vacate Common Pleas' November 16, 2020 order, through which it reversed the Charter Board's Final Order.

Even so, we elect to remand this matter to the lower court, due to the fact that Mayor Scott raised a number of currently unresolved arguments at the Common Pleas level that are not properly before us at this stage. On remand, Common Pleas shall consider and rule upon those arguments, in a manner that takes into account, and is consistent with, the analysis in and outcome of this opinion. As already mentioned above, these arguments are as follows. The Charter Board: (1) violated Mayor Scott's due process rights throughout the process of adjudicating Schlegel's complaint against him; (2) unlawfully punished him for violations of the Home Rule Charter that had not been alleged in Schlegel's complaint or pertained to sections of the Home Rule Charter that did not apply to him; and (3) levied penalties upon him that were unlawful, unconstitutionally imposed, and were not supported by substantial evidence.

_____
ELLEN CEISLER, Judge

24

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Honorable Wally Scott, : 
Mayor of the City of Reading : 
  : 
  : 
v. : No. 1307 C.D. 2020
  : 
City of Reading Charter Board, : 
                        Appellant : 

## O R D E R

AND NOW, this 14th day of October, 2021, it is hereby ORDERED:

1. The Court of Common Pleas of Berks County's (Common Pleas) June 29, 2020 order, through which granted Appellee The Honorable Wally Scott, Mayor of the City of Reading's (Mayor Scott) Petition to Supplement the Record, is REVERSED;

2. Common Pleas' November 16, 2020 order, through which Common Pleas reversed Appellant City of Reading Charter Board's (Charter Board) December 13, 2019 Final Opinion and Order, is VACATED; and

3. This matter is REMANDED to Common Pleas, with instructions that it address, and rule upon in a formal order, the following arguments that Mayor Scott raised before the lower tribunal, but remain unresolved, and that Common Pleas do so in a manner that takes into account, and is consistent with, the analysis in and outcome of the foregoing opinion:

a. The Charter Board violated Mayor Scott's due process rights throughout the process of adjudicating Ernest Schlegel's complaint against him;

b. The Charter Board unlawfully punished Mayor Scott for violations of the City of Reading's Home Rule Charter that had not been alleged in Schlegel's complaint or pertained to sections of the Home Rule Charter that did not apply to him; and

c. The Charter Board levied penalties upon Mayor Scott that were unlawful, unconstitutionally imposed, and/or were not supported by substantial evidence.

Jurisdiction relinquished.

_____
ELLEN CEISLER, Judge